2b 535
88   70

2b 535
89  316

2bu 535
e109 715

CASE 5—PETITION EQUITY—SEPTEMBER 29.

# Latimer, &c., vs. Glenn, &c.

APPEAL FROM BOONE CIRCUIT COURT.

1. A conveyance of land made by the husband to the use of his wife, in the execution of a previous purchase and sale, and to carry out a previously undertaken trust, and for which she had paid an ample pecuniary consideration, she having the legal title, with an equity untainted with illegality or fraud, cannot be disturbed.

2. The conveyance of land made by the husband to the use of his wife, under circumstances which made it the voluntary discharge by the husband of an obligation which the chancellor would have compelled

on the proper application of the wife, was not fraudulent or void, nor in violation of the statute of 1856 against fraudulent conveyances in contemplation of insolvency.

3.   If a husband should voluntarily enter into a contract to make a settlement, or should actually make a settlement, upon his wife and children, in consideration of personal property, coming by distribution or bequest to her from her relatives, to no greater extent than what a court of equity would, upon suitable application, direct him to make, this will be held valid upon him and his representatives, and equally so against his creditors. (*Story's Equity Jurisprudence, 2d volume, section 1377a.*)

4.   Where the wife advances or charges her separate estate for her husband's use, *intending it as a loan and not as a gift*, she will be considered as the creditor, and will be supplied with all the means of enforcing the demand against her husband's estate which the creditor possessed. (*Clancy on Husband and Wife, chap.* 12, *page* 590.)

5.   Where the wife joins the husband in a conveyance of her real estate in this State, and thereby converts it into personalty, which the law gives to him, equity will presume it to be a gift, unless this presumption is repelled by the evidence.

PRYOR & CHAMBERS,                    For Appellants,

CITED—

4 *Met.*, 213; *Mellet vs. Pottinger.*

1 *Met.*, 403; *Short vs. Tinsley.*

4 *B. M.*, 430; *Bank U. S. vs. Heath.*

3 *B. M.*, 554; *Brown vs. Foree.*

7 *B. M.*, 357–9; *Brown vs. Smith.*

5 *B. M.*, 311; *Young vs. Stalling.*

1 *J. J. M.*, 358.

3 *Mon.*, 186; *Mitchell vs. Maupin.*

4 *Met.*, 80.

6 *B. M.*, 609.

7 *B. M.*, 357.

6 *Dana*, 185.

1 *Dana*, 269.

5 *B. M.*, 306.

3 *Dana*, 511.

Latimer, &c., vs. Glenn, &c.

5 *J. J. Mar.*, 574.

4 *Met.*, 86; *Maraman's ad'r vs. Maraman.*

4 *Met.*, 80; *Ward vs. Crotty, &c.*

STEVENSON & MYERS,                        For Appellees,

CITED—

1 *Ky. Rev. Stat.*, 546.

7 *Dana*, 107; *Whitesides vs. Norris.*

8 *B. M.*, 525; *Martin vs. Trigg.*

4 *Met.*, 143; *Hurdt, &c., vs. Courtenay, &c.*

8 *B. M.*, 525; *Martin vs. Trigg.*

1 *Leading Cases in Equity*, 386.

3 *Met.*, 474; *Hocker and others vs. Gentry.*

2 *Leigh*, 49; *Blow vs. Maynard.*

3 *Mon.*, 186; *Mitchell vs. Maupin.*

1 *J. J. Mar.*, 390; *Gully vs. Grubbs.*

2 *Leigh*, 40–47; *Blow vs. Maynard.*

2 *Johnson's Ch. R.*, 490; *Reade vs. Livingston.*

3 *Johnson's Ch. R.*, 501; *Reade vs. Livingston.*

4 *Met.*, 145; *Hurdt, &c., vs. Courtenay, &c.*

4 *Met.*, 59; *Ward vs. Crotty, &c.*

*Civil Code, sec.* 674.

2 *Met.*, 517.

4 *Met.*, 86; *Maraman's ad'r vs. Maraman.*

4 *Met.*, 139; *Courtenay, &c., vs. Hurdt, &c.*

7 *Dana*, 259; *Stephens' ad'r vs. Barrett's ad'r.*

6 *Dana*, 265; *Harrison vs. Campbell.*

JNO. F. & CHAS. H. FISK,                   On same side,

CITED—

1 *Rev. Stat., chap.* 40, *sec.* 2.

1 *Rev. Stat., chap.* 22, *sec.* 1, *subd.* 5.

3 *Littell*, 434; *Jones' heirs vs. Henry Pitt's heirs.*

13 *B. M.*, 501; *Kinnaird, &c., vs. Daniels, &c.*

4 *Met.*, 60; *Ward vs. Crotty, &c.*

4 *Met.*, 86; *Maraman's ad'r vs. Maraman.*

5 *B. M.*, 306; *Marshall, &c., vs. Hutchison, &c.*

4 *Met.*, 143; *Hurdt, &c., vs. Courtenay, &c.*

5 *B. M.*, 308; *Young vs. Stalling.*

1 *Met.*, 397; *Short vs. Tinsley.*

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

R. J. Latimer and his wife, Madeline, were married in the year 1833 or 1834. She had a landed and personal estate by devise from her father of about seven thousand dollars.

The real estate was sold from 1847 to 1849, she joining her husband in the deeds, amounting to about four thousand seven hundred dollars.

The husband had some estate of his own, and was merchandising, from the year 1835 to 1846, in Burlington, and had then in the firm between four and five thousand dollars.

After withdrawing from this firm, he commenced a wholesale dry goods business in Cincinnati, in partnership with Jenkins, and continued therein some three or four years. This firm also seems to have done a prosperous business. It began about January, 1846.

After living at Cincinnati some time, his wife's health seems to have become delicate, and he then purchased a farm and residence near Carrollton, Kentucky, and spent some five or six thousand dollars improving it.

About the year 1850 he took an interest in a wholesale hardware establishment in Cincinnati. He still continued to reside near Carrollton, however, for several years. He then exchanged his farm near Carrollton for real estate in Indiana.

In 1854–5 he purchased a tract of about one hundred and ten acres near Burlington, Kentucky, for about four

thousand four hundred and eight dollars and fifty-six cents, upon which he erected a comfortable mansion, costing some eight thousand dollars. The hardware firm to which he belonged failed in 1861, and creditors attached his Indiana lands in April, 1862.

May 10, 1862, he sold to Cravens and Utz Indiana lands amounting to some three thousand one hundred and fifty dollars, and on 13th to Stephens and Early, amounting to some three thousand one hundred dollars, and June 11 to Harper, amounting to three thousand two hundred and forty dollars—in all nine thousand four hundred and ninety dollars.

June 9, 1862, he conveyed to his son, C. L. Latimer, in trust for the use of his wife, Madeline, the home place near Burlington, reciting that the consideration was the seven thousand dollars received from her father's estate, which he had promised to invest for her. He was then in the last stage of consumption, of which he died July 22, 1862, greatly insolvent.

At the time of making this deed to the use of · his wife, he executed a mortgage on his household furniture and all his personal estate to Corbin, reciting a consideration of two thousand dollars that day loaned to him, to be repaid in two years. He also owed a considerable individual debt to his neighbors and acquaintances.

Several of these appellees, as his creditors, filed their petition in his lifetime to attack said conveyances as fraudulent, made for the benefit of his wife and the mortgage to Corbin.

Several of them did not file their petitions until after his death, and some not until six months had expired from the qualification of his administrator, said C. L. Latimer.

There was no recital in the deeds from Latimer and
wife of her real estate to the several purchasers that
the proceeds were to be hers, or invested for her use,
or any equivalent expression; as to this these are wholly
silent. Mrs. Madeline Latimer answered, denying any
fraud or knowledge that her husband was insolvent at
the time of the execution of her deed; but insists that
it was made to carry out a long standing promise of
her husband to invest the proceeds of her estate, de-
vised by her father for her use and benefit; that the
farm near Burlington had been bought at her instance,
and was of her selection, because situated among her
relatives and the associates of her youth; and her hus-
band then promised to have it conveyed to her, which
she thought was done until after she signed the two
deeds, dated May 10, 1862; that finding it was not so
done, she refused to sign the other deeds to the Indiana
lands until her husband promised, if she would do so,
he would secure to her, by a proper conveyance, the
home place. She then signed the other deeds. That by
the laws of Indiana she was entitled to one third of
the lands in fee simple, and that she never would have
signed the first deed had she not believed the home
place had already been secured to her. She also
signed deeds to his other Kentucky real estate, which
seemed, however, not to have been very valuable.

The evidence strongly tends to prove that her husband
recognized his indebtedness to her for the property de-
rived from her father's estate, with a promise to invest
it for her from the reception of it until the purchase of
the Burlington property; after which she ceased to claim
and he ceased to acknowledge an indebtedness, but con-
stantly and persistently recognized the place as hers;
and in his most prosperous days, when he and his friends

regarded him as wealthy, he consulted friends as to how much interest he should pay his wife on her money which he had been using.

When he exchanged the Carrollton farm for the Indiana lands, he offered to have the lands conveyed to her in discharge of this indebtedness, but which she refused to take, insisting that he should purchase for her a home near Burlington, which he soon after did, stating, at the time of the purchase, to his vendor, he was purchasing for his wife.

Whilst the Burlington property was being improved she remonstrated against so much outlay, saying it would be better for her to have some of her money to loan out and have an income, than to have it all in a fine house; but the husband would say it was hers, and to make her a comfortable home, and she should not object to its improvement.

She signed the deeds to convey his real estate for the payment of his debts without remonstrance and cheerfully, until she discovered that the home place had been conveyed to her husband in such manner as not to secure it to herself. She then refused to sign any more until she had an assurance that the home place should be secured to her. Her husband was then in the last stage of consumption, which must certainly soon terminate his existence. She knew he was in laboring circumstances, as he was then selling his real estate to pay his debts.

Under such circumstances she would hardly have parted with her fee simple interest in the Indiana, and her dower interest in the Kentucky lands, had she not believed that the home place had been secured to her. She refused to join in the deeds subsequent to her knowledge that it had not been, until she had an assurance that it should be.

The chancellor set aside the conveyances to her use, also the mortgage to Corbin, as fraudulent, and ordered a sale for the benefit of these appellees, from which she alone appeals.

Judge Story, in his *2d volume Equity Jurisprudence*, *section* 1372, *page* 736, lays it down, that though by the principles of the common law contracts made between husband and wife after marriage are a mere nullity—for there is deemed to be a positive incapacity in each to contract with the other—yet, although courts of equity follow the law, they will, under peculiar circumstances, give full effect and validity to post-nuptial contracts; as if a wife, having a separate estate, should, *bona fide*, enter into a contract with her husband to make him a certain allowance out of the income of such separate estate for *a reasonable consideration*, the contract, although void at law, would be held obligatory and enforced in equity. So, if the husband and wife, for a *bona fide* and valuable consideration, should agree that he should purchase land and build a house thereon for her, and she should pay him therefor out of the proceeds of her own real estate, if he should perform the contract on his side, she should be compelled to perform it on her side.

And in *section* 1373 he says it is upon similar grounds that a wife may become the creditor of her husband *by acts and contracts during marriage*, and her rights as such will be enforced against him and his representatives; as if a wife should unite with her husband to pledge her estate or otherwise to raise a sum of money out of it to pay his debts, or to answer his necessities, whatever might be the mode adopted to carry that purpose into effect, the transaction would, in equity, *be treated according to the true intent of the parties.* She would be deemed a creditor or a security for him, if so originally under-

stood between them, for the sum so paid; and she would be entitled to reimbursement out of his estate, *and to the like privileges as belong to other creditors.*

Again, at *section* 1377*a*, he says: If a husband should voluntarily enter into a contract to make a settlement, or should actually make a settlement upon his wife and children in consideration of personal property coming by distribution or bequest to her from her relatives, to no greater extent than what a court of equity would, upon a suitable application, direct him to make, this will be held valid upon him and his representatives, *and equally so against his creditors.*

Mr. Clancy, in his work on Husband and Wife (*chap.* 12, *p.* 590), says:

"Where the transaction is a mortgage by husband and wife of her real estate, with a view to pay his debts *or to promote his interest,* she will be considered in equity as a creditor for the money, and as entitled to have his personal assets applied in discharge of the amount—the court looking upon him as the debtor, and on her lands as only an additional security. So, where the wife advances or charges her separate estate for her husband's use, *intending it as a loan and not as a gift,* she will be considered as the creditor, and will be supplied with all the means of enforcing the demand against her husband's estate which the creditor possessed. *Such is the doctrine, which seems to be without exception or qualification.*"

The great question is to determine whether the wife intended to make a gift to her husband, or whether she meant to make him her debtor. And where the wife joins the husband in a conveyance of her real estate in this State, and thereby converts it into personalty, which the law gives to him, equity will presume it to be a gift, unless this presumption is repelled by the evidence. But

when, as in this case, the husband, for a number of years, acknowledges his indebtedness, and promises to pay interest, and these made through a period of prosperity and when he was amply able to perform, we cannot doubt but that the presumption of a gift is rebutted, and the wife's claim as creditor fully established.

The purchase of the home place for his wife, his ceasing afterwards to acknowledge his indebtedness to her, and her ceasing to assert any claim on him, and her claim of the property as hers, purchased and improved with her means, and believing, as she did, that the title was so fixed as to secure the property to her, although in reality the husband had taken the title to himself, raises a resulting trust to her, not prohibited by *section 20, chapter 80, 2 Stanton's Revised Statutes, 230,* but comes within the savings of *section 22.* This conveyance to the use of the wife, therefore, was only the voluntary discharge by the husband of an obligation which the chancellor would have compelled on the proper application of the wife.

Neither was this a mere voluntary conveyance by the husband to the wife, but one founded on a valuable consideration. Nor was it a conveyance in contemplation of insolvency to prefer one creditor to another, but was a conveyance in the execution of a previous purchase and sale, and to carry out a previously undertaken trust.

Mrs. Latimer's equity is as elevated and pure and sacred as that of any creditor of her husband; her conduct is free from any fraud or overreaching, or concealment of any character; nor does it manifest any desire to screen the property of a failing husband from the just demands of his creditors, but only an honest effort to secure that which she regarded as her own, and which had been frequently accorded to her in the most prosper-

ous days of her husband, and for which she had paid an ample pecuniary consideration. She having the legal title, with an equity untainted with illegality or fraud, cannot be disturbed.

The plaintiffs' petitions, so far as they sought to set aside her conveyance, or to bring it within the operation of the statute of 1856, should have been dismissed absolutely; and, on the return of the cause, the court will do so, and order a restitution of whatever she may have paid on her purchase of the property under the decretal sale.

Wherefore, the judgment is reversed, with directions for further proceedings in accordance herewith.

---

To A PETITION FOR A REHEARING, PRESENTED BY THE COUNSEL FOR THE APPELLANTS, JUDGE WILLIAMS DELIVERED THE FOLLOWING RESPONSE:

The briefs were originally read and well-considered, and the authorities examined, therefore the decision was not made "*through oversight or mistake on the part of the court*," nor could the counsel "know beyond peradventure that if the members of this court had been in possession of the facts of this case, and of the law applicable to it, *this decision never could have been rendered*."

The case of *Reade vs. Livingston* (3 *Johnson's Chy. R.*, 485) was where a husband, being indebted some six years before the deed, *conveyed all his estate*, of about forty-five thousand dollars, in trust for his wife; and to sustain this, set up a pretended ante-nuptial parol contract, in which he had agreed with his wife's father to settle upon his intended wife and her children thirty thousand dollars of his property; and even this was not proved; but had it been, this was not the securing the

wife her own estate, but a conveyance of the husband's estate in fulfillment of a pretended ante-nuptial parol agreement that the husband would settle upon her of his own estate the amount. A stronger case of actual fraud could hardly be imagined.

In *Blow vs. Maynard* (2 *Leigh*, 48) the wife had joined her husband in the sale of her real estate, worth one thousand five hundred dollars, under the asserted parol agreement that he would convey and settle upon her and her children the property in contest, *which he then owned* in Portsmouth, and which, six years after this asserted parol agreement, he did convey to the use of her and her children, when he had become totally insolvent—the real estate worth five thousand dollars, and personalty of five hundred dollars. The agreement to convey real estate is very different from a trust to invest the wife's money. A stronger case within the statute of fraud rarely occurs, nor one with more badges of bad faith.

In *Satterwaite vs. Emily*, 3 *Green's N. J. Chy. R.*, 491, the chancellor held that the declarations of the husband made during coverture, and shortly before the conveyance by the wife and husband of her property in trust for her use, are not sufficient to establish an ante-nuptial agreement; but if, says the chancellor, such ante-nuptial agreement was established to secure the wife's property to her, it would *not be voluntary but upon a valuable consideration*.

The case of *Borst vs. Corey*, 16 *Barbour*, 138, was an attempt on the part of the wife to hold a trustee responsible for not collecting a bond entered into by her husband after marriage, reciting an ante-nuptial agreement to secure her $1,300, the value of her dower interest in her first husband's real estate. As all the obligor's estate was necessary to pay his honest debts, and there was

*no proof* of the ante-nuptial contract but the recital of the bond, this was held insufficient to establish it, and very properly so; for if husband and wife could thus manufacture evidence, creditors would never be safe. Such evidence was held insufficient by this court in *Kinnaird vs. Daniels*, 13 *B. M.*, 496, the only evidence of which was two letters of the husband of anterior date to the marriage; but whether the letters bore the true date of their writing was not proved. To the same effect is the case of *Jones vs. Henry*, 3 *Littell*, 433.

The case of *Hacker vs. Gentry*, 3 *Met.*, 474, was a contest between the collateral kindred, as heirs of the deceased wife, against her husband, Kelly, to compel him to surrender thirty-three and one third acres of land, the title of which he held.

This court said there was no written agreement on the part of Kelly to purchase this land for her; and a mere parol agreement to purchase land is within the operation of the statute of frauds and perjuries. But this court also said, if a man, in violation of a verbal agreement with his wife, should purchase land in his own name with effects belonging to her, there would be a resulting trust as coming within the exception to *section* 20, *chapter* 80, *Revised Statutes*. But no such agreement was established in the case.

Parol ante-nuptial contracts are denounced by statute as invalid; and when marriage alone is the consideration, and the property settled after marriage is out of the husband's estate, and to the detriment of his creditors, these have been generally held fraudulent and void both in England and America (*see* 1 *Story's Equity Juris.*, *sec.* 374, *and note* 1, *pp.* 359–60); but still high authority has doubted the justice and equity of setting aside an executed contract of that kind; but when it is the se-

curing. to the wife her own estate, which, by a parol ante-nuptial contract, established to the satisfaction of the court, the case becomes much stronger; and this court, *in Hall and wife vs. Leight, Barret & Co., Summer Term,* 1866, 2 *Duvall,* upheld the title of the wife, based on such ante-nuptial parol contract.

A thorough analysis of all the adjudicated cases and elementary works will develop the following classes of cases:

1. Where there is a written ante-nuptial contract and settlement.

2. An ante-nuptial written contract and post-nuptial settlement in pursuance thereof; these have been universally upheld as against both prior and subsequent creditors.

3. An ante-nuptial parol agreement and a post-nuptial settlement in pursuance thereof; these have been sometimes upheld, when free from actual fraud, and under peculiar circumstances.

4. *Post-nuptial* contracts and settlements; these have been uniformly upheld when founded on a valuable consideration and free from any badge of fraud, and as uniformly set aside when not founded on a valuable consideration or tinctured with badges of fraud.

In the elaborately discussed case of *Blow vs. Maynard,* Judge Carr said: "The cases also show that not only the relinquishment by the wife of a certain and fixed interest in her husband's estate, but also a contingent interest, will support a post-nuptial settlement where there is no badge of fraud." And, "if parting with these contingent interests by the wife will support such settlements, it follows, *a fortiori,* that her parting with *her own estate,* or making a charge on it for her husband's benefit, will support them."

In *Smith vs. Green et al.*, 3 *Henry's Tenn. R.*, 120, the post-nuptial settlement reciting an ante-nuptial parol agreement was held not to be upon a valuable consideration, and within the operation of the statute of frauds and perjuries, but good against subsequent creditors as a voluntary post-nuptial settlement, unless fraudulent as to existing debts at its making.

Mrs. Latimer has shown, not by the mere recitals of the deed, but by numerous facts extending through a series of years, the agreement of her husband to invest the proceeds of her lands and personalty derived from her father, amounting to some seven thousand dollars, for her use and benefit, and that he had so invested it with its interest in this Burlington farm; and however insufficient the recitals of deeds or letters, or even the statement of the husband, to prove an ante-nuptial contract, these facts abundantly establish this agreement.

These numerous facts are recited in the opinion, and will not be here repeated. Suffice it to say, that she presents herself gracefully on the record, with clean hands and a pure heart, her entire conduct being compatible with the purest morals.

It is not at all satisfactorily shown that the farm was worth more than the money derived from her estate with its accumulated interest; indeed, at the public sale, under the decretal order, it brought less than six thousand dollars, and this is an indication that it was really not worth the seven thousand dollars and its interest. Her husband had offered her the Indiana lands received for the Carrollton place, which he afterwards sold for about nine thousand six hundred dollars, but which she refused, because she desired her means invested in a home for her near Burlington.

We have said this much to show that this decision con-
flicts with none of the adjudicated cases to which we
have been referred, but is upheld by some of them; nor
with the elementary doctrine, and from a high regard for
the learning and research of the petitioner's counsel, as
well as to demonstrate that neither confidence nor zeal
are infallible tests of truth, nor the development of the
beauty, the symmetry, and the science of the law, nor the
purity of its maxims, nor the sublimity of its equity.

The petition is refused.