CASE 103—ACTION TO ENJOIN THE EXECUTION OF A WRIT OF POSSES-
SION—FEB. 1.

## Sparks v. Colson, &c.

APPEAL FROM BELL CIRCUIT COURT.

JUDGMENT FOR PLAINTIFF AND DEFENDANT JAMES SPARKS APPEALS.
AFFIRMED.

HUSBAND AND WIFE—TRANSFER IN FRAUD OF CREDITORS—JUDGES—DIS-
QUALIFICATION—RELATIONSHIP.

Held:   1. Where the wife's father paid one-third of the considera-
tion for land purchased by the husband under an agreement,
to which the wife was a party, that she should own one-third
of the land and its proceeds, but the husband took the title to
himself, a deed executed by him after he became insolvent, and
after the wife's death, conveying one-third of the land to her
infant son by direction of her father, will not be set aside at the
instance of the husband's creditors.

3. Neither the fact that a brother-in-law and a brother of the judge had
each married an aunt of the infant plaintiff, nor that the judge
was decidedly partial to plaintiff and his father, and was on the
most intimate terms of friendship with the father, was suffi-
cient to disqualify him to act in the case.

3. The mere statement of a party in his affidavit that the judge is
personally hostile to him, without any statement of facts, is not
sufficient to make a *prima facie* showing of prejudice.

N. B. HAYS, ATTORNEY FOR APPELLANT.

From this record the following facts are established beyond
question without evidence to the contrary, and we ask a reversal
of the judgment and modified judgments, and that the lower
court be required to vacate the bench and we rely upon the fol-
lowing:

POINTS PROVEN AND AUTHORITIES CITED.

1. The appellant, James Sparks, has been a creditor of the appellee
W. G. Colson since 1889.

2. That the appellee W. G. Colson has been insolvent and attempt-
ing to defraud his creditors since January 1, 1888.

3. That said Colson paid the consideration for said lots whether they were conveyed to James M. Wheeler or James M. Colson.

4. That said Colson was as 'to his creditors both the legal and equitable owner of said lots when levied on and sold under the execution in favor of the appellant.

5. That if said lots were conveyed to J. M. Colson or to J. M. Wheeler by the Pine Mountain Iron & Coal Company on January 24, 1891, said conveyance was procured by W. G. Colson who paid the consideration therefor and was made to defraud his creditors, and as to said creditors said conveyance was void, and said lots were therefore subject to said execution.

6. We say that the judgment appealed from can not be upheld in law or upon justice and that it and that part thereof made by the court upon his own motion is a blot on the records of the court that rendered it, and from the following statutes and decisions the law must be rewritten to uphold it: Ky. Stats., secs. 968, 496, 1906, 1907, 2353 and 2354; 1 Dana, p. 533 and 79 Ky., 519, Doyle v. Sleeper, &c.; 80 Ky., 132 and 7 Bush, 397, Adams' Executor v. O'Rear, et al.; 83 Ky., 32 and 2 Bush, 535, Mathews v. Albritton; 85 Ky., 392 and 5 J. J. Marshall, 552, Scott's Executor v. Scott.

7. If this property was, when levied on, or now is, the property of J. M. Colson, the appellant has no lien on it for the payment of a debt of W. G. Colson. It is our contention that the appellant has not only an equitable interest in said lots, but by reason of the sheriff's sale and conveyance is the legal owner of it, or he has no claim on it.

A. K. COOK, FOR APPELLEE.

(No brief in record.)

OPINION OF THE COURT BY JUDGE O'REAR—AFFIRMING.

It appears from this proceeding that W. G. Colson was possessed of considerable property in Bell county, Ky., from 1883 to about 1890, some by inheritance and some by purchase. He had married a daughter of J. M. Wheeler, who also owned an estate of some $40,000. While in solvent circumstances, Colson purchased a tract of land, for speculation apparently, situated in Bell county, his father-in-law paying one-third the consideration for it, and Colson

Sparks v. Colson, &c.

the remainder, the title to which was taken to Colson un-
der an agreement with the father-in-law and the wife
that she was to own one-third of the land and its proceeds.

It is not shown that Mrs. Colson ever knew that her hus-
band took title to this tract of land to himself alone, or
that she consented that he might do so.  The proven agree-
ment was that she was to own one-third of the land and its
proceeds.  Subsequently Colson sold this land and other
property to the Pine Mountain Iron and Coal Company,
taking in exchange about $1,300 in cash, and notes to him-
self for $5,000, and agreeing to take the two lots in con-
troversy in this suit, being lots Nos. 10 and 11 of block 13,
Pine Mountain Iron and Coal Company's addition to the
town of Pineville.  This was during the boom period, when
values of all properties in that section were more or less
inflated, and of town lots especially so.  The sale of the
land known as the "Collins Tract," in which Mrs. Colson
or her father had the interest stated, was made in 1890,
during her lifetime (she having died in August, 1890), but
was not conveyed until January, 1891.

Then it seems that Colson, in attempted fulfillment of
his agreement with his wife and the father-in-law, started
to have the deeds to the Pineville lots made to Wheeler,
but at Wheeler's direction caused the deed to be made to
Colson's infant son, the appellee, J. M. Colson, son of his
deceased wife.  At that time Colson seems to have become
extensively involved in debt, and was striving for time as
against his creditors, resorting to many methods familiar
in such transactions.    Appellant, Sparks, subsequently
procured a judgment against W. G. Colson for $97.93, and
some $13 costs, on a liability antecedent to the deed to J.
M. Colson, and caused the execution to be levied on the two
lots, and became the purchaser at the sheriff's sale at the

amount of his debt and costs. The lots were appraised at $1,000 ($500 each), which is shown to have been their fair value.

Appellee, the infant, by his next friend, brought this action against the creditor and the sheriff, seeking to enjoin the execution of the writ of possession, the infant not having been a party to the proceeding under which the lots were attempted to be sold. The circuit court upheld the title of the infant, and perpetuated the injunction.

The principal questions for our consideration are: (1) Was the agreement and transaction between the debtor, W. G. Colson, and his wife and father-in-law, such as could have been enforced against Colson? And (2) in that transaction, and Colson's attempt to execute that agreement, in violation of appellant's right as Colson's creditor? Even in the absence of the numerous high authorities on the subject, we would have no hesitancy in adopting the views herein expressed. These authorities include many examined, but not cited. Those from this court, covering a long period, and the services of many of its most illustrious members, are deemed sufficient. The facts above stated are proven beyond question; indeed, are proved by witnesses introduced by appellant. There is no evidence to the contrary. The usual difficulty in applying the principles of this decision to cases attempted to be brought within their operation is the proof of the consideration moving the conveyance, and the question of fraud on the part of the debtor. The fact that the man is largely in debt, insolvent, and makes a preferential conveyance to his wife, are circumstances calculated to arouse suspicion, bringing seriously into question the truthfulness of the alleged agreement. An examination of the cases where the principles of this decision have been denied will

show generally that the proof was not satisfactory, or
tended to show positive fraud, or that the personalty of
the wife had been reduced to possession by the husband
without any agreement, and that the agreement for settle-
ment on her and the settlement were made after he be-
came insolvent, and many years after he had received her
property. If this were an action by Mrs. Colson against
her husband to compel the execution of the contract be-
tween them, we do not doubt that the chancellor would
be amply justified in decreeing its specific performance.
He agreed with her and her father that, if he was given
the possession of this $1,000 which the father held for
her, he would invest it in land, and that, to the extent
her money paid for it, it should be her land, and, when
sold, she should have a corresponding right to the pro-
ceeds. This was a commendable and lawful contract, with
sufficient valuable consideration to uphold it. Having re-
ceived the consideration on the terms named, he was
morally and legally bound to convey to her the agreed in-
terest in the land, or in event of its sale, an equal interest
in its proceeds. The proceeds of the sale included the
lots in controversy, and, as the husband took to himself
the cash and cash notes received for the land, leaving
only the lots of no greater value than her interest in the
original tract, he would have been compelled at her suit
to have conveyed them to her. That he has voluntarily
done what in good conscience and under the law he was
bound to do can detract nothing from the act. In the
case of Lyne v. Bank, 5 J. J. Marsh, 552, the court denied
the wife's claim because it was not founded on an ante-
nuptial contract, or an agreement made before the hus-
band had reduced the wife's property to possession. In
Latimer v. Glenn, 2 Bush, 535, it seems the husband re-

duced his wife's personalty to his possession without an express agreement to reimburse, but subsequently, when proposing to convey some of his land, in which she held potential dower, he agreed to make a settlement upon her equivalent to what he had received from her, if she would relinquish the dower; she having refused to do so until he made such an agreement. The court upheld that contract, and, the husband having conveyed to her, while in failing circumstances, a homestead of no greater value than her property received by him, the transaction was upheld as against his creditors. In Miller v. Edwards, 7 Bush, 394, the wife owned real and personal estate in her own right, but not her "separate estate," which her husband took upon the marriage, converting the personalty, and afterwards the proceeds of the realty, which they conveyed, he agreeing to reinvest the proceeds in other realty in her name. However, he took the title to himself "for reasons consistent with the husband's integrity," without her knowledge or consent. They afterwards sold this last-named land, and he again agreed with the wife to reinvest the proceeds in land, to be secured to her as the former should have been; "but without her knowledge or consent the title was again conveyed to the husband for a singular reason, but consistent with his honor." They afterwards sold and conveyed this tract, too; but a portion of the proceeds—not more than what the husband had received of his wife's property—was evidenced by notes, which were agreed to be placed in the hands of a stranger to hold in trust for her. The husband's creditors attached, attacking this last-named transaction as to the notes as fraudulent as to the creditors. Responding to this attack of the creditors, this court, speaking through Chief Justice Robertson, said: "The foregoing

facts show that the appellant, Nannie, without any vol-
untary act for placing the ostensible title in her husband,
and without the semblance of fraud in any respect, has
already, through her husband and his creditors, lost at
least half of her patrimonial estate; and, if the judgment
in this case be affirmed, she will have lost nearly the whole
of it.   But such loss can not be sanctioned by the facts
and the established principles of equity.   Such a contract
as that made with her husband before her land was sold
is valid and enforceable, as between the parties to it, as
a prudent mode of preserving her estate against his im-
providence or capricious power.   Even without any ex-
plicit stipulation, an available trust resulted by implica-
tion, unaffected by the statute of frauds or of conveyances.
This principle now requires no citation of authorities in
its support.   Nor does section 20, c. 80, of our Revised
Statutes, affect the trust, because the title was conveyed
to her husband against her will, and in violation of fidu-
cial faith.   There is no ground to presume that the hus-
band ever intended to convert the wife's estate or its
proceeds to his own use, or that any act of hers sanctioned
any such conversion.   As between themselves, therefore,
all that remains is equitably as much hers as ever it was.
The execution of the notes to her separate use was, con-
sequently, not a voluntary settlement of which creditors
could complain, but only a partial fulfillment of a long an-
tecedent trust, founded on not only a valuable, but sacred,
and much more than a commensurable, consideration.
The notes, expressing the trust on their face, could de-
ceive no creditor, and would give notice to any purchaser
or other assignee.   The appellees do not stand in the at-
titude of purchasers, and in that of creditors their equity
is less meritorious than that of the appellant, Nannie,

and long posterior to its origin continuously preserved. Before they became creditors they had constructive notice of her rights, and a court of equity should not help them to devest her of this fragment of her inheritance." This court again, in the more recent case of Sanders v. Miller, 79 Ky., 519, reaffirms the same salutary principle in the following language: "While contracts made beveen husband and wife, as a general rule, are void, still __ a husband voluntarily enter into a contract to make, or he does make, a settlement upon his wife in discharge of an obligation arising out of the reception of her property under an agreement made before its receipt or reduction to possession, such as the chancellor would, on her application, make upon her, neither the contract nor the settlement would be regarded as fraudulent against creditors." The fact that the conveyance was made by the husband to his wife's child at the instance of her father after her decease, while not a literal compliance with his contract, was nevertheless an attempt on his part to do so in such manner as was satisfactory to, and directed by, the only one of the parties to the agreement who was alive, and whose interest in his daughter's offspring would naturally prompt him to look after their welfare as against their father's interest. Whether the infant plaintiff took the complete title to the lots, or holds it in trust for his deceased mother's other children, is not necessary now to determine; for, in either event, he was entitled to be protected in its complete possession as against the writ sought to be enforced by appellant.

After the issue in this case had been formed, demurrers and motions to strike from pleadings having been filed and acted on by the court (whose rulings in determining them we think were correct), appellant filed his affidavit

with the clerk of the court attempting to show cause
against the regular judge's presiding in the case, and
moved the court that an election be held for a special
judge to try this case. The court overruled the motion.
The affidavit stated that the affiant (appellant) had learned
since the issues in the case were joined that the Honorable
M. J. Moss, judge of the court, was related to some of the
parties to the action, and proceeded to state the relation-
ship. The affiant says that the judge's wife's brother
married a sister of the infant plaintiff's father, that the
next friend suing for the infant plaintiff had married
said infant's cousin, and that the judge's brother had
married a sister of the plaintiff's father. We are of the
opinion that this relationship, if it can be termed more
than a "visiting" one, is too remote to have in any proba-
bility biased the judgment of the judge, or even a juror.

The next point made in the affidavit was that the judge's
brother-in-law was surety on a *supersedeas* bond executed to
stay proceedings on the judgment rendered in that court
awarding the possession of the lots in controversy to af-
fiant, and that the decision of this case would determine
the liability of the parties to that bond. The affiant was
in error, in our opinion, as to the legal effect of the *super-
sedeas* bond in question. That bond had been executed in
another proceeding. The appeal had been prosecuted and
dismissed. The liability of the parties to the bond there-
by became fixed, and in no wise could the determination
of this suit affect it.

The affidavit further stated that the judge and his
brother-in-law, J. S. Bingham, and the infant plaintiff's
father, W. G. Colson, were, and had always been, on the
most intimate terms (of friendship, it is presumed), and
engaged in many business transactions together, and "that

said Moss has a decided partiality for co-defendant, W. G. Colson, and the plaintiff, J. M. Colson." In the nature of our judiciary system, the judges are selected from lawyers resident of the district, and who have been practicing their profession for at least eight years. It is quite natural to suppose that in every instance they have been on intimate terms of friendship with many of their fellow citizens, and engaged in the past in business enterprises with them. The fact of their election may be held to indicate cordial, friendly sentiments towards them of quite a number—indeed,of the majority—of the men of their districts. To hold that such a state of facts would disqualify the judge from acting in some suit wherein some of these parties were remotely or indirectly interested would be ridiculous. It would at once impeach the high character of our circuit judiciary, so long established, and so rarely questioned.

The affidavit further proceeds to say that "the judge is personally hostile to this affiant herein." In Insurance Co. v. Landram, 88 Ky., 433, (11 S. W., 367, 592), this court held that, to require the judge to vacate the bench, and give place to a special judge to try the case, the affidavit must state such facts as would prevent the judge from properly presiding in the case,—such as personal hostility, personal interest, partiality, etc.,—of the sufficiency of which the judge must, of necessity, judge, but subject to appeal. But it is not enough to merely assert the fact of personal hostility or partiality. He must state the facts which he alleges constitute the state of feeling complained of. We have held that the truthfulness of the facts stated can not be questioned by the judge (Vance v. Field, 89 Ky., 178, 12 S. W., 190); therefore it is all the more important that the facts, and not the litigant's conclusions

or suspicions, be set forth, that this court may have au opportunity of testing their sufficiency if the trial judge should hold them insufficient. This was the practice ap. proved in Massie v. Com., 93 Ky., 590, 20 S. W., 704. We conclude that the circuit judge rightly declined to vacate the bench in this case. We have examined this record with much care, and fail to discover wherein appellant's rights have in the slightest degree been prejudiced by the lower court's rulings, or the judgment appealed from. The judgment is therefore affirmed.