CASE 75.—ACTION BY HARVEY McDONALD'S ADMINISTRA-
TOR AGAINST THE WALLSEND COAL & COKE
CO. FOR CAUSING THE DEATH OF PLAINTIFF'S
INTESTATE.—March 17, 1909. .

# McDonald's Adm'r v. Wallsend Coal & Coke Co.

Appeal from Bell Circuit Court.

M. J. Moss, Circuit Judge.

From a judgment of non-suit, plaintiff appeals.—
Reversed.

1. Master and Servant—Injuries to Servant—Contributory Neg-
ligence.—Coal mine employes entitled to use the tracks of an
electric railway into the mine when leaving the mine at
the close of the day's work, may assume that the employer
will not run cars into the mine while they are going out,
and an employe is not chargeable with contributory negli-
gence for failing to anticipate that cars will be run into the
mine.

2. Master and Servant—Injuries to Servant—Contributory Neg-
ligence.—An employe placed suddenly in a position of peril
by the negligence of the employer is not bound to exercise a
correct judgment, and is not chargeable with contributory neg-
ligence because he failed to take the safer of the two ways
open to him.

3. Master and Servant—Injuries to Servant—Contributory Neg-
ligence.—Coal mine employes, leaving the mine at the close
of the day's work, used an electric railroad track, which
was the only way provided for them. The employer ran cars
into the mine while the men were coming out at an exces-
sive speed without any headlight or gong. An employe on
the cars, suddenly coming on the men, sought to escape,
leaving the track at the side where he was walking, but the
entry was too narrow to enable him to clear the track, and
he was killed. The passage was dark, being only lighted
by the miner's torches. Held, that the employe was not as
a matter of law guilty of contributory negligence.

4. Judges—Disqualification—Bias.—The bias of a judge does not legally disqualify him from trying a case, unless it causes him to act corruptly or with such oppression as to be equivolent to corruption, and the cause for the removal of a judge must be such that, if he assumes to act in spite of it, it involves his personal integrity, or makes it improper that a man of integrity should preside in that matter, and the mere fact that a judge is unfriendly to personal injury suits does not disqualify him from trying a personal injury action.

5. Judges—Disqualification—Affidavit—Sufficiency.—An affidavit to remove the regular judge on the ground of bias filed by plaintiff in action for injuries while a coal mine employe, which stated that the judge was a stockholder and officer in a coal mine, that it was thought that he was inimical to the interests of the miners, that he was on friendly social terms with mine operators and that it was the common talk among lawyers and citizens that his friendliness to mineowners and unfriendliness toward damage suits created a bias in his mind, which made it difficult for an employe to get a fair trial of his case, did not state facts showing affirmatively a personal bias toward the litigant or his case essential to remove a judge on the ground of bias.

6. Judges—Bias—Affidavit—Time to File.—An affidavit to remove the regular judge because of his disqualification by bias must be presented promptly on the discovery of the facts.

B. B. GOLDEN attorney for appellant.

W. T. DAVIS of counsel.

The facts, contained in this record, disclose that the appellee owned and operated at the time of the injury complained of a mining plant known as a Drift Mine in which there were numerous entries and cross entries in which it had in use electrical motors with which to haul its coal from the mine. There were some hundred or more miners on this occasion employed in these mines. The deceased, Harvey McDonald, a man of good education, fifty years of age, after having finished his day's work in his room in these mines, together with twelve or fifteen others, was coming out of the mine. They were in the main entry and the only avenue which all of the miners had to travel in order to get out of the mines, and into them, and were within about six or eight hundred feet of the drift mouth when sudden-

vol. 135—40

McDonald's Admr. v. Wallsend Coal & Coke Co.

ly and almost without a moment's warning this motor with more than twenty empty cars attached to it, without sounding the gond and without the headlight burning and coming at an unusual and dangerous rate of speed ran among these men, all of whom sprang to the sides of the entry for safety. The deceased in his haste and excitement happened to get off the track and to the rib side at a point where the track was so near the rib side that portions of the motor and cars came violently in contact with him, knocking him down and dragging him about eighteen feet against a post that was so near the track that the cars had been scraping against it theretofore so often that they had cut a grove in it and his leg was broken and he was injured on his head, back, and body, and internally, so that he died with two or three days after the injury.

WM. LAW and O. V. RILEY for appellee.

## CONCLUSION FROM THE TESTIMONY.

The testmony showed the following clear conclusions:

1. That the injured man and the others with him at the time of the accident were traveling along the motor-way during the work-time of the motor-crew, and thus unnecessarily and imprudently exposed themselves to danger.

2. That the injured man did not exercise that vigilence for his own safety that a prudent person would have done under the circumstances nor as other persons along with him did.

3. That the motorman did not fail to do anything that he could or should have done to have averted the injury after seeing the deceased in peril.

## QUESTIONS OF LAW.

If these conclusions from the testimony are well founded, there are but two questions of law for the Court to consider so far as the merits of the action are concerned, which are as follows:

1. Was it negligence in appellee for the trip to have been made without the electric-light on the motor, when the crew each had a driver's lamp burning in his cap, and the trip was being made in regular time, and when the noises from the operations of the motor are more timely and effective warnings than the head-light if burning, or gong had it been used, could have been?

2. If this be held in the affirmative, then the question of deceased exercising due care for his own safety, the time, place and the manner of the accident being considered, alone remain.

OPINION OF THE COURT BY JUDGE O'REAR—Reversing.

Harvey McDonald, a miner in the service of appellee, was injured by being run against by an electric motor and train of cars in appellee's mine in Bell county. There was a custom, as well as an agreement between the mineowner and the miners, that the latter were to "shoot" their coal twice a day—at 11:15 a. m. and 4:15 p. m. One hundred to 150 coal miners worked in the mine. When they had cut under the face of the coal far enough to place a charge of powder in a drilled hole at the top and fire it off, the coal would be knocked down. The smoke and gas generated by the discharge made it impossible for the miners to stay in the rooms and passages for awhile after the shots were fired; so it was arranged that all should shoot about the same time, which was near enough to quitting time, whether for the noon rest or in the evening, that the mines would clear of smoke and gas before the men went back to work. From the time of shooting 15 minutes were allowed the miners in which to get out of the mine. On the day appellant's intestate was injured the miners began shooting about 4:15, the intestate among the others. As they set off the charges, they withdrew and started out the main entry to leave the mine, which was the only way out. Electric motors were used to take in the empty coal cars, and to draw out the loaded cars. These motor cars had a speed of about 12 miles an hour. The main entry was about five feet high. The entry varied in width, but at places was less than six feet. The entry was not straight. An overhead wire to the side of the entry transmitted the current of electricity, which was fed to the motor by a trolley

from the side of the motor car. At 4:15 p. m. the
motor car was on the outside of the mine. The
motorman then notified the mine boss that the head-
light on this car was out of fix, and was not of use.
The gong on the car was also out of repair, and could
not be sounded. The mine boss promised to have the
car repaired by morning, but directed the motorman
to take in another lot of empty cars. The motorman
demurred on account of having no headlight, and be-
cause it was then shooting time, and the miners would
be coming out. The mine boss looked at his watch
and told the motorman that, if he would hurry up, he
could make it in time. The motor car, coupled to
about 20 empty coal cars, then started in the mine,
running at its highest speed. When in the mine about
1,200 or 1,500 feet, and directly after it had passed
around a curve, the train ran into a squad of miners
who were walking along the track coming out of the
mine after their day's work. There was no warning
of the approach of the train except the humming noise
made by the trolley, and the noise of the cars on the
rails. The noise, of course, indicated that a motor
was running on that track, but whether coming in or
going out it would not very well indicate. As the
trolley passed the retaining brackets electric flashes
would appear at those points. But, as the cars were
around the bend, these flashes would not show further
than the bend. The intestate was in this squad of
miners. Their walking and talking made some noise,
and the frequent discharges of the blasts in the rooms,
which were then being set off, further confused the
sounds. This was the situation when the train dashed
into the midst of this company of miners. They
jumped to the side of the track for safety. But de-
cedent McDonald failed to reach a place of safety.

At the point where he jumped off the track the entry was too narrow to admit his person in the clear at the side of the cars. As they passed, they struck him, caught him, and rolled him along the side of the mine, bruising and mangling him so that he died within three days. This suit is by his administrator to recover for the negligent destruction of the life of the intestate. At the close of the plaintiff's evidence, which disclosed the foregoing facts, the court gave the jury a peremptory instruction to find for the defendant. It is supposed this instruction was based upon the fact that the intestate was himself guilty of contributory negligence, but for which he would not have been hurt. The contributory negligence in this case is thought to have consisted of two factors: One, the decedent was either inattentive and failed to listen for the cars, or, hearing them, failed to exercise due care for his own safety; the other is that on the opposite side of the entry where he was struck there was room enough for him to have stood in safety while the cars passed.

We cannot doubt it was negligence, we might say criminal negligence, in running that train of cars at that time and under the circumstances at such high speed without headlight or gong to announce its approach. It was such an utter disregard of the lives of the men who were known to be coming out that entry, and who had to walk along the track, the entry being too narrow in many places to admit of their walking by the side of the track, or to get into a place of safety by its side, as makes the master liable for any injury inflicted upon them by reason of that act. Nor was it certain that the decedent was guilty of contributory negligence. He had a right to use the track to walk upon in coming out the mine. No other way

was provided him.   He had the right to assume that the master would not run the motor car into the mine while the miners were coming out—particularly not at the speed run in this instance—and without a headlight or gong on the motor car.  He was not required to give attention to or to anticipate what reasonably he had not cause to suspect.   Besides, he had not control of the other miners' movements—their walking, talking, and laughing as they went along the passage way, nor the shooting that was going on in the rooms along the route.   All these matters tended to confuse sounds, which were equally well known to the master and those operating the motor car, and decedent had the right to assume that with knowledge of such conditions the master would regulate the running of the trains so as to make the situation as safe for the miners as the conditions admitted of.   When, contrary to such reasonable presumptions, the master ran the train of cars recklessly in the entry so as to suddenly imperil the decedent, he was not bound in such emergency to exercise correct judgment, or to select the safer of the two ways presented to his mind in that moment.   He had the right to act upon impulse, as he was deprived by the master's negligence of a reasonable opportunity to exercise judgment. The impulse would be to take the nearest apparent means of safety.   That was to leave the track at the side where he was walking, which he did.   He probably had not time to cross the track.   He took the chance of being able to find a safe place on his side. The passage was dark, narrow, and low.   The only light was the feeble rays shed by the miner's cap torches.   In choosing the means that he did the decedent acted as any ordinary person might have done under the circumstances.   Whether he was guilty of

contributory negligence at all on the evidence now in the record was barely presented so as to let the question go to the jury. But it was not such, in any event, as to make his conduct as a matter of law a bar to his right of recovery for the injuries which his master's negligence had inflicted. The motion for the peremptory instruction ought to have been overruled.

This action was begun in 1905. The docket of the Bell circuit court is said to be large. The issue was made up in this case some two years ago, and one trial was begun, but was discontinued for the plaintiff, owing to illness in his lawyer's family. When the case was called the last time for trial, plaintiff filed an affidavit to remove the regular judge of the court because of his disqualification by bias. The facts disclosed, so far as they are facts, instead of rumors and suspicions, had existed since before the beginning of this case, and were known to the plaintiff and to his counsel from the beginning. No effort was made when this suit was filed, or at the first term of the court thereafter, to remove the judge because of his alleged bias. On the contrary, the parties submitted their case to his rulings. The judge is charged with being unfriendly to personal injury suits, and as himself being connected with a coal mining corporation. The judge is not charged with corruption, nor with being personally hostile to the litigant, nor as entertaining a particular antipathy toward the plaintiff or his suit. It is said he does not look with favor upon litigation growing out of personal injuries. It is likely some judges have just the opposite feeling concerning such suits. But we do not see that that fact necessarily disqualifies the judge from presiding at the trial of such cases in his court. Judges, like other men, have their notions of right and wrong, which

may not agree with the law of the matter. Their alleged bias may, so far as they are concerned, be a matter of conscience. Unless it causes them to act corruptly, or with such oppression as to be equivalent to corruption, we do not see how it can legally disqualify the judge as an official. A juror may not look with favor upon personal injury suits, or say that he may, and in his previous service his predilections have in some manner affected, or colorably affected, his verdicts. Would that subject him to challenge for cause in all cases of that nature? We doubt it. A judge will not be removed for the same causes always that a juror may be peremptorily challenged for. The cause to remove a judge must be one which, if he assumes to act in spite of it, involves his personal integrity, or which makes it improper that a man of integrity should preside in that matter. German Ins. Co. v. Landrum, 88 Ky. 433, 11 S. W. 367, 592. It is not always corrupt. So far as the man's own conscience is concerned, it may be innocent. But it must be such a cause as that an impartial mind would conclude that a person so situated would not probably, and could not, give a fair trial in the case. The substance of the complaint in this case is that the judge was a stockholder and officer in a coal mining company; that it was thought he was "inimical" to the interests of the miners; that he is on friendly, social terms with mine operators; that it was common talk among certain lawyers and citizens that his friendliness to the mine-owners and unfriendliness toward damage suits created a bias in his mind, which made it difficult for the workman to get a fair trial of his case. The latter is stated as a deduction from the predicate, much of which is "rumor of the county,"

and talk of certain lawyers who had been disappointed in court. This affidavit in this case involves more the question of character than of particular bias in the judge. The latter only is a matter reviewable by this court. Character is for the people in their elections or for the Senate sitting as a court of impeachment. The lack of character is such as disqualifies the man altogether. If an appellate court could say in such instance that the judge must vacate the bench upon complaint of any litigant who attacked his general character as a man, we must sit necessarily as a court of impeachment, which we cannot do. And it would result, if we did, that that judge could try only such cases as the litigants and lawyers in his court would suffer him to try. No; we cannot review these sweeping general charges. We have not the jurisdiction to do so. The trial judge's position is a hard one to fill. It is hard to please a losing litigant. Some lawyers when they lose are not convinced by the judge's judgment—perhaps ought not to be. But, if these conditions are allowed to constitute a basis for impeaching the judge without trial, the circuit judiciary are indeed in a most unenviable condition; for, when attacked by an affidavit, the judge must sit dumb as to the truthfulness of the grounds charged. He cannot deny them, though he may know them to be false. He cannot call witnesses to refute them. He cannot even cross-examine his accuser. He must confine himself to deciding, by the standard erected by the law, whether the affidavit is sufficient to require him to vacate the bench in that case. It must be a delicate and embarrassing situation. Nevertheless he alone must first pass judicially upon the matter. Hence it is that the

statute has been construed that the affidavit must state facts. German Ins. Co. v. Landrum, supra; Sparks v. Colson, 109 Ky. 711, 60 S. W. 540; Schmidt v. Mitchell, 101 Ky. 570, 41 S. W. 929, 72 Am. St. Rep. 427; Hargis v. Marcum, 103 S. W. 346, 31 Ky. Law Rep. 795; Ky. Journal Co. v. Gaines, 110 S. W. 268, 33 Ky. Law Rep. 402. They must show affirmatively a personal bias toward the litigant or his case (Massie v. Commonwealth, 93 Ky. 588, 20 S. W. 704), and must be presented promptly upon their discovery (German Ins. Co. v. Landrum, supra; Ky. C. R. R. Co. v. Kenny, 82 Ky. 154; Vance v. Field, 89 Ky. 178, 12 S. W. 190; Russell v. Russell, 12 S. W. 709, 11 Ky. Law Rep. 547; Bales v. Fennell, 49 S. W. 759, 20 Ky. Law Rep. 1564). The affidavit in this case did not fill those requirements. That seems to be admitted in the argument, but we are asked to go further in this case. We find no warrant to do so.

For the error in granting the nonsuit the judgment is reversed, and cause remanded for a new trial under proceedings consistent herewith.