## White v. Jouett.

(Decided February 28, 1912.)

### Appeal from Clark Circuit Court.

1. Partners Must Deal Fairly With Each Other.—Where a partner attempts unfairly to acquire a gain at the expense of his co-partner, he commits a breach of faith for which the law gives an action to the defrauded partner.

2. Judge—When He Should Vacate the Bench.—Where a defendant to an action filed a demurrer to the petition; made a motion to strike therefrom, and other motions throughout a term of the court, he cannot, at a subsequent term, rely on facts which he knew existed when the first term of the court was held, as a ground to require the judge to vacate the bench. His acts in participating in the preliminary steps of the trial waived any objection he might have had to those pre-existing facts.

3. Judge—Sufficiency of Grounds for Him to Vacate.—The facts upon which the belief of a litigant that the judge will not give him a fair trial, is based, must be stated in the affidavit, and they must be of such a character as would prevent the judge from properly presiding in the case; and, if the charges are false they should be made in such a manner as would subject the party making them to a criminal punishment.

4. Trial—Instructions.—Where the court gave an instruction, based upon facts which would authorize the jury to find for the plain-

tiff, it was not a reversible error for it to fail to connect said instruction, by reference, to subsequent instructions which authorized a finding for the defendant upon the state of facts therein predicated. If all the instructions, considered as a series, presented the law applicable to the case fully and accurately, it is sufficient.

5.  Pleading and Practice—Form of Recovery.—Where the plaintiff sued to recover shares of stock in a corporation, or their value, and the defendant refused to deliver the stock upon demand, an instruction basing the plaintiff's right to recover upon the money value of the stock, was proper.

6.  Corporations—Value of Stock of.—In an action for the value of shares of stock in a corporation, the measure of damage is the value of the stock at the time of the conversion, or a reasonable time thereafter; if there is no known market value, the value may be proven by showing the value of the property and business of the corporation, less the amount of its liabilities.

7.  Verdict—Erroneous Method Employed In Fixing It.—Where it is clear from the evidence that the jury used erroneous data as the basis for their calculation in fixing the amount of their verdict, and thereby gave plaintiff a verdict for largely more than the proof warranted, the judgment will be set aside upon the ground that it is not sustained by the evidence.

O'REAR & WILLIAMS, JAMES F. WINN, JOHN M. STEVENSON and S. M. WILSON for appellant.

PENDLETON, BUSH & BUSH, ALLEN & DUNCAN and HAZELRIGG & HAZELRIGG for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

This is an action by Edward S. Jouett against John G. White, to recover one-third of the commissions received by White as compensation for selling 14,589 acres of coal and timber land in Leslie, Harlan and Letcher Counties, for the Burt & Brabb Lumber Company. For many years prior to 1909, Jouett had been the attorney at Winchester, Ky., for the Burt & Brabb Lumber Company. He was also a nominal stockholder and director in that company. The Burt & Brabb Lumber Company, of Kentucky, had bought the Kentucky lands of the Burt & Brabb Lumber Company, of Michigan; and in order to finance the deal quickly, the Kentucky corporation undertook to make a quick sale of those lands. Jouett desiring to make the sale and earn the fee, the company agreed to give him as compensation for making a sale whatever he might secure above the price of $10 an acre, and to further assist him in making

a sale at an advanced figure, the company agreed to announce and adopt whatever prices he might quote to his purchasers, and keep, as confidential, the price of $10. For reasons satisfactory to himself, Jouett thought it advisable, in July, 1909, to associate with him in finding a purchaser, the appellant, John G. White, and H. C. Thompson and H. G. Garrett, all of whom were more or less familiar with Kentucky lands and prospective purchasers therefor.

Jouett was a lawyer, busily engaged in the practice of his profession at Winchester, and was willing to divide the fee rather than take too much of his time from his practice. By the agreement between Jouett and his three associates above named, any excess over $10 an acre should be divided between them in the proportions of three-ninths to Jouett, and two-ninths to each of his three associates. This agreement, however, did not take from Jouett his right to make a sale and thereby earn the entire commission; it only gave his associates jointly two-thirds of the commission in case they produced the purchaser. Several negotiations were started between July and December, 1909, with various prospective purchasers—M. S. Barker, of Louisville, being one of these prospective purchasers, who was introduced by White. On December 1st, 1909, Barker was given a ninety day option, which was extended thirty days longer, to buy the land at $12.50 per acre. This option was to expire April 1st, 1910. After the Barker option had been given, the negotiations with Barker were carried on by White in person, he reporting from time to time, to Jouett. It was understood by all parties concerned that Barker and his associates did not really intend to buy the land for themselves, but that Barker was acting as a promoter, with the hope of organizing a company that would take over the lands at a price in excess of his option price of $12.50 per acre. It became apparent in March, 1910, that Barker had failed in carrying out his plan, and that he and his associates were not to be further considered as possible purchasers. White went to Louisville on March 14th, 1910, and it then became known beyond any further question that Barker and his associates were no longer to be so considered. White returned to Winchester on the next night—March 15th—and reported to Jouett in a conversation at the hotel, that Barker would not be able to complete the purchase of the land; and, in the same conversation White stated to Jouett, for the

first time, that he had interested another purchaser, not giving his name however, but that this purchaser would not pay more than the minimum price of $10 an acre. White thereupon asked Jouett to secure from the Burt & Brabb Lumber Company an; option at $10 per acre for the new purchaser, whose name he had not yet given. Jouett was somewhat astonished and irritated at what he conceived to be a breach of confidence upon the part of White in disclosing the minimum confidential price of $10 an acre to this new purchaser, and he declined to speak to Burt upon the subject. White, however, immediately went to the telephone, and having called up Burt, informed him of his proposed new purchaser of the land at $10 an acre. White then returned to Jouett in the hotel lobby and told him that Burt wished to speak to him over the telephone. Jouett thereupon talked with Burt over the telephone; and, as a result of these conferences, a meeting was arranged for the next day—the 16th of March—at Jouett's offices. While they were still in the hotel, however, Jouett reminded White that a sale at $10 an acre would not give either of them any compensation whatever, for making the sale, since that was the lowest net price for which the Burt & Brabb Lumber Company would sell the lands. White conceded that to be true; whereupon Jouett asked him the direct question, whether or not he (White) would receive any profit or commission from this new sale. According to Jouett's testimony, White responded that he would not receive any profit or commission on this sale, except indirectly; but that he might receive some indirect benefit by reason of the fact that he had blocked up some other lands in the neighborhood of these lands, which he could probably sell at a profit if this sale was made. According to White's testimony, he answered Jouett's question by saying there would be no commission to him (White) only in case of a re-sale of the lands. Jouett denies that White said anything about a re-sale of the land, or that he expected to get a commission or compensation in any event out of this sale. On the next day, the morning of March 16th, and before going to Jouett's office, White met Burt at the Hotel in Winchester, and talked over the proposed new sale with him. In the subsequent conference at Jouett's office, Burt showed some hesitation in proceeding with the proposed new sale, and remarked that the sale of the property had been left in Jouett's hands, and at this price there would be no compensation

for Jouett out of the sale. Gibbens says Burt asked White whether there was to be any compensation to him in the new sale, and White again said there was none directly, although he might work something out of it in the future. This answer seemed satisfactory to all concerned, in the light of the explanation given by White, and the fact that was generally known to all of them, that White either had already gotten control, or expected to get control, of some adjacent lands, which he could sell at a profit in case the Burt & Brabb Lumber Company's lands changed hands. Burt and Gibbens, who was an officer of the Burt & Brabb Lumber Company, and Jouett then retired to another room, where Jouett stated to Burt that he would not undertake to stop the sale, and that Burt could go ahead with it at the new price of $10 per acre, so far as he (Jouett) was concerned. They then returned to the other room, and Burt agreed to give the new option at $10 per acre, as desired by White. Burt then said to Jouett, that since he had worked a long time trying to make a sale but without success, and they would need his services in closing it, the Burt & Brabb Lumber Company had decided to give him $2,000 as an honorarium; whereupon Jouett said, that while he was not claiming anything, and would not stand in the way of his friends making a sale, he would accept the $2,000 in the same spirit in which it had been offered him. The option was then drawn by Jouett, acting as attorney for the Burt & Brabb Lumber Company. In preparing this option, White disclosed, for the first time, that Robert Carnahan, of Louisville, was the new purchaser. As the Barker option extended to and included April 1st, and Barker had not surrendered his option although it was well known that he would do nothing under it. it became necessary to make Carnahan's option operative on or after April 2nd. Accordingly, that option required Carnahan to pay $40,000 to the Burt & Brabb Lumber Company between 8 o'clock a. m. and noon of April 2nd, 1910, as an exhibition of his good faith and intention to buy the lands within 30 days. The second paragraph of section 4 of the option, however, further provided as follows:

"If, however, within the aforesaid thirty days, to-wit: on or before May 2nd, 1910, second party decides that he does not care to go on with said purchase, or if within said period the parties hereto can not agree upon what tracts be embraced within this sale, then and in

that event, this contract shall be null and void, without liability upon the part of either party to the other, and thereupon first party shall forthwith return the full amount of said forty thousand dollars ($40,000).''

In substance, this was an option to Carnahan for thirty days from April 2nd, 1910, to May 2nd, 1910, with a deposit of $40,000.00 earnest money which was to be returned to Carnahan at any time before May 2nd, if he should conclude not to buy the lands. All he could lose would be one month's interest, or $200.00, which might be considered as a fair price for the option.

Before leaving Winchester on March 16th, White dictated and carried with him to Pineville, a contract between himself and Carnahan, which was executed on March 16th or 17th, by both parties, and which reads as follows:

''This agreement made and entered into this 16th day of March, 1910, by and between Robert Carnahan, of Louisville, Kentucky, and John G. White, of Winchester, Kentucky, parties of the first and second part.

Witnesseth: That for and in consideration and stipulation hereinafter set out, said White has this day caused to be made a contract drawn between the said Carnahan and the Burt & Brabb Lumber Company of this date, in which the Burt & Brabb Lumber Company offers to sell to the said Carnahan fourteen thousand eight hundred acres (14,800) of land in Leslie, Harlan and Letcher counties, at ten ($10) dollars per acre, forty thousand ($40,000.00) dollars to be paid in cash between 8 and 12 o'clock noon, April 2, 1910, which the said Carnahan agrees, if he accepts this contract, to be present at Lexington, Kentucky, on April 1, 1910, with a certified check for the above amount in fulfillment of the said contract. Said Carnahan further agrees to do or have done, that is to carry out all of the stipulations in the contract as described in said contract between Burt & Brabb Lumber Company and the said Carnahan.

''Carnahan agrees, he and his associates, to purchase or procure purchasers for this land at fifteen ($15) dollars per acre, which would amount to about seventy-five thousand $(75,000.00) dollars profit.

''It is understood and agreed between each of us that Carnahan is to receive one-third (1-3) of the profits derived from this sale and said White is to receive two-thirds (2-3).

''And a further consideration, said White agrees,

in addition to the one-third (1-3) profits derived from this sale, to give said Carnahan five thousand ($5,000) dollars of his stock. Any other deductions from said profits must be shared alike; White, two-thirds (2-3), Carnahan one-third (1-3) according to the interests stated in this contract.

"It is further agreed by the said Carnahan that as soon as this deal is closed, he is to organize a stock company on the basis of the acreage of fifteen ($15) dollars per acre and all of the stock is to be issued to him, and he agrees and binds himself to transfer to the said White all right, title and interest in two-thirds (2-3) of the profit as above stated. In the event said deal is not made, according to the terms of this contract and the contract between the Burt & Brabb Lumber Company and Carnahan, then, the said Carnahan agrees and binds himself to return to White the said contract between the Burt & Brabb Lumber Company and the said Carnahan.

"Given under our hands this, the day and year first above written.

"JOHN G. WHITE,
"R. CARNAHAN."

In the meantime, however, and as early as March 1st, White had undertaken to get Carnahan interested, in some way, in a purchase of these lands, and Carnahan had finally agreed to buy them for himself and his associates at $10.00 per acre, provided the lands turned out to be what they were represented to be. The lands were located in the neighborhood of Pineville, Ky., and Carnahan had gone to Pineville on March 16th for the purpose of examining the lands. He was in Pineville for that purpose the day on which the option was given to White for Carnahan at Winchester. White went to Pineville on the night of the 16th, and met Carnahan and one of his associates there the next day. On March 28th Carnahan exercised his right to buy the lands by depositing the $40,000.00 called for by the contract of March 16th. Subsequently, on April 27, 1910, Carnahan and his Louisville associates organized the Greasy Fork Coal & Timber Company, and on May 10th, 1910, the Burt & Brabb Lumber Company, at Carnahan's request, conveyed the lands directly to the Greasy Fork Coal & Timber Company. Shortly thereafter, Jouett learned, in a measure, of the agreement between White and Car-

nahan; and by prosecuting the clue he found, what has subsequently been brought out in the proof in this case, that negotiations had been begun by White with Carnahan early in March, 1910, looking to a sale of the lands to Carnahan, while the Barker option was still in force, and while White was representing to Jouett that the Barker option would really be closed. After two interviews with Carnahan in Louisville on the 7th or 8th of March, White and Carnahan came to an agreement, by which White should secure for Carnahan from the Burt & Brabb Lumber Company an option on these lands at $10.00 per acre, and in consideration therefor Carnahan was to organize a company, composed of himself and his Louisville associates, whom he had already interested in the deal. This company was to take over the lands at $15.00 an acre, and the profit of $5.00 an acre, aggregating $72,000.00, was to be divided between White and Carnahan in the proportion of two-thirds to White, and one-third to Carnahan. Between that time and March 15th. Carnahan had interested A. V. Thompson, Rice and Gordon, of Louisville, in the formation of this company to buy the lands. Carnahan and his associates had held a meeting in Louisville, at which they had agreed to send A. V. Thompson to Bell county to examine the lands, and if his report was favorable, they would organize a company and take over the lands at $15.00 per acre, according to the understanding between White and Carnahan. On March 14th. White went to Louisville; he completed the details of the arrangement with Carnahan on the 15th., returned to Winchester that night and had the conference as heretofore narrated with Jouett at the hotel; and on March 16th., while the option was being prepared, Thompson and Carnahan were in Pineville to investigate the lands, and they waited there until White came with the option on the night of the 16th. White admits that before he left Winchester to go to Pineville on the 16th. he went to the office of Stevenson, his attorney in Winchester, and dictated to his stenographer the terms of the agreement which he had verbally made with Carnahan the day before in Louisville, and hereinbefore set forth in full. White took this contract with him to Pineville, and had it signed by Carnahan at the time the option was delivered; and, pursuant to this contract, White admits that he received capital stock of the Greasy Fork Coal & Timber Company of the par value of $40,500.00.

Jouett sued White on July 30, 1910, to recover one-third of said stock or its value, and recovered a verdict for $13,500.00. From a judgment upon that verdict, White prosecutes this appeal.

1. The demurrer to the petition was properly overruled. Where a partner attempts unfairly to acquire a gain at the expense of his co-partner, he commits a breach of faith for which the law gives an action to the defrauded partner. There are two modes, says Lindley, in which, more especially, partners attempt unfairly to acquire gain at the expense of their co-partners; (1) by directly making a profit out of them; and, (2) by appropriating to themselves benefits which they ought to have acquired, if at all, for the common advantage of the firm.

In the case at bar White comes clearly within the second class of cases, since he used his position as partner, and the information he had thereby acquired, to make a profit for himself, which good faith and conscience required that he should have made for the partnership.

Lindley on Partnership, star page 310, says:

"A partner, moreover, is not allowed in transacting the partnership affairs, to carry on for his own self benefit, any separate trade or business which, were it not for his connection with the partnership, he would not have been in a position to carry on. Bound to do the best for the firm, he is not at liberty to labor for himself to their detriment; and if his connection with the firm enables him to acquire gain, he can not appropriate that gain to himself on the pretense that it arose from a separate transaction with which the firm had nothing to do."

The general doctrine is stated in 30 Cyc. 458, as follows:

"While the partnership relation continues, the law imposes upon each partner the duty of acting with the utmost good faith toward his co-partners. It treats him as their confidential agent in all partnership transactions, and subjects him to the inability of such an agent to secure for himself that which it is his duty to obtain, if at all, for the firm of which he is a member. Accordingly, if he purchases property for his individual benefit, or takes a lease of it when the firm is entitled to the advantage of such purchase or lease, or secures a valuable contract for himself, which it was his duty to obtain for the firm, he will be treated as a trustee thereof for

the firm and be compelled to account to the firm for the profits of his transaction, unless such a purchase or transaction is assented to by his co-partners.''

In McCutcheon v. Smith, 33 Atl. Rep., 881, 173 Pa., 101, Smith and McCutcheon, members of a firm, after dissolution, and in order to save a debt, bought a farm for which each paid half the purchase money and took the title jointly. Subsequently, Smith made a contract to sell the entire property for $8,500, and immediately after doing so, and without disclosing that fact to Mc-Cutcheon, bought McCutcheon's half interest for $2,500. McCutcheon sued Smith to recover one-half of Smith's profit, and in sustaining the recovery the court said:

''In view of the facts thus conclusively established, the master was fully warranted in his conclusions that Smith's duty in the premises was to fully inform Mc-Cutcheon of the Rolshouse contract; that the relation of trust and confidence which had so long bound them together could not be severed by the one buying out the other's interest in the farm without first divulging to the fullest extent all the knowledge he possessed concerning their joint enterprise. Smith did not do this. On the contrary, at the very time he induced McCutcheon to sell and convey his half interest in the farm to himself for $2,500, he had Rolshouse's agreement to pay $8,500 for both interests, and adroitly concealed the fact until he accomplished his purpose.''

See also Brooks v. Martin, 69 U. S., 70; Rich v. Black, 33 Atl., 880, and Farmer v. Samuel, 4 Litt., 187.

Likewise, in the case at bar, White, who had been employed by Jouett to make a sale of these lands by which both of them could make a profit, secretly procured a contract with Carnahan, which was, in all of its substantial features, completed before the dissolution of their partnership relations at the meeting in Winchester on March 15. All that remained to be done was to obtain a new option from the Burt & Brabb Lumber Co., and this was only obtained through the conciliatory attitude of Jouett. It is plain from the proof that if Jouett had not then stepped aside, the Burt & Brabb Lumber Co. would not have given White the Carnahan option. White's precaution in getting Jouett to retire before getting the new option for Carnahan, can not relieve him of his liability to Jouett, since Jouett's retirement was brought about by representations made in violation of the very partnership rights which were thereby severed.

Under this state of facts Jouett, upon the discovery of the true situation, had the right to sue for his share of the profit which really belonged to the partnership.

2. It is insisted, however, that the trial judge should have vacated the bench upon the filing of the affidavit at the December Term. It will be remembered that the petition was filed July 30, 1910. At the September Term White filed a demurrer to the petition, which was overruled, and on the next day he made a motion to require plaintiff to make his petition more specific, which was properly overruled. Four days later White moved to strike out certain parts of the petition, and by agreement the case was re-assigned to a day for trial. The motion to strike from the petition was sustained in part, and overruled in part; and on the next day White filed his answer, and moved for a subpoena duces tecum, which was issued. Five days later plaintiff made a motion to strike out certain parts of the answer, but the motion was overruled; and on the same day plaintiff further moved to strike out the second paragraph of the answer, and this was sustained. These proceedings necessarily continued the case to the December Term. During vacation plaintiff filed his reply, which contained a traverse only. Thus, when the December Term began on December 5, the case stood ready for trial, with the issues made; and it was not until three days thereafter that White filed his motion and affidavit to require the judge to vacate the bench. When the case was called for trial, White moved for a continuance, and filed his affidavit setting out what he could prove by Burt and Mayo, two absent witnesses, whereupon the judge held the affidavit sufficient, and that White was entitled to a continuance. Thereupon plaintiff agreed that the affidavit might be read as Burt's deposition; that he would produce Mayo on the trial; but that if Mayo failed to come, the swearing of the jury should be set aside, and the case continued. The circuit judge, however, held that White was entitled to a continuance, notwithstanding this offer of plaintiff; whereupon, the parties agreed as follows: "The plaintiff and the defendant agreed to answer ready, and that the case be tried upon terms that the plaintiff admit that the witness C. W. Burt would testify as set out in the affidavit, and the testimony of said witness as set out in said affidavit should be read as the deposition of said C. W. Burt." There was a further agreement as to Mayo, but he appeared

at the trial. It appears, therefore, that White was not only not forced into trial, but after the court had granted him a continuance, he agreed with plaintiff to try at that term. The affidavit is long, and falls naturally into two parts: First, that part which relates to what occurred before the September Term of the court, when the motions and orders above recited were made, and the pleadings made up; and, secondly, that portion which relates to transactions that occurred between the September Term and the December Term of the court. It is unnecessary to speak further concerning the facts that occurred or existed prior to the September Term, since it is a well settled practice that White waived any objection he might have had to the judge by reason of those facts by the part he took in the trial at the September Term. He knew all those facts at the September Term as well as he knew them at the December Term, and the law does not permit one to proceed with his case until he subsequently becomes dissatisfied, and then rely upon facts which he had known all the time, for the purpose of getting rid of an unsatisfactory judge.

Passing to that portion of the affidavit which relates to what occurred after the September Term, it is proper to bear in mind the rule this court laid down in the leading case of German Insurance Co. v. Landrum, 88 Ky., 433:

"The cause to disqualify a judge, as said by this court in Turner v. Commonwealth, should not be trivial, 'but should be a legal and substantial one, and so the section should be construed in cases involving the propriety of a judge's presiding, and the necessity for a special judge on that ground.'

"The statute could not have been framed with a view of protecting a corrupt or partial judge by keeping from the records of the court such grave charges against him. If corrupt it should be known and the bench vacated for all time, instead of temporarily, and if the charges are false they should be made in such a manner as would subject the party making them to criminal punishment. The fact or facts upon which the belief that the judge will not give the litigant a fair trial should and must be stated in the affidavit, and they must be of such a character as shall prevent the judge from properly presiding in the case.

"The objection to the trial judge becomes, in fact, a question of jurisdiction, and the objection, to be avail-

able, must be made before an appeal, and to the merits of the action or the submission of preliminary motions by either party preparatory to a trial.''

The foregoing language was approved in Sparks v. Colson, 109 Ky., 720, whereupon the court added this language in explanation of the former opinion:

''But it is not enough to merely assert the fact of personal hostility or partiality. He must state the facts which he alleges constitute the state of feeling complained of. We have held that the truthfulness of the facts stated can not be questioned by the judge (Vance v. Field, 89 Ky., 178, 12 S. W., 190); therefore it is all the more important that the facts, and not the litigant's conclusions or suspicions, be set forth, that this court may have an opportunity of testing their sufficiency if the trial judge should hold them insufficient.''

And in Erwin v. Benton, 120 Ky., 542, this court further said:

''If the mere allegation in the objecting affidavit were sufficient, then it were possible always to remove a trial judge upon the mere charge of a litigant, without his hazarding anything if his statements should be untrue.''

To the same effect see Massie v. Commonwealth, 93 Ky., 588; Schmidt v. Mitchell, 101 Ky., 570, and Hargis v. Marcum, 126 Ky., 279.

The second portion of the affidavit relates to events connected with the election of November, 1910, in which White and the circuit judge, belonging to different political parties, supported opposing candidates. Among other incidents, White approached the judge in the court house and protested against the use of the court house, and the offices, for certain electioneering proceedings which he had heard the judge was engaged in; whereupon the judge responded: ''I don't propose to take any suggestions from you. Mr. Garrett and I will settle this matter.'' In response to that statement White said: ''Yes, you don't propose to take any suggestions from me when you know that you are sitting as judge in my case, and you know right now you don't intend to give me a fair trial.'' In his affidavit White says the judge thereupon turned and left him, without making any reply whatever.

The affidavit contains one further immaterial incident that occurred between White and the judge upon the election day, and some further charges which are made upon information and belief. It concludes by stat-

ing that the plaintiff and the circuit judge were friends, officers of the same church, belonged to the same political party, and their families were intimate; and that the plaintiff and the judge were on these intimate terms before the judge went upon the bench. Concerning these last suggestions as to the social and political relations of the parties and to show they are without merit, it is sufficient to refer to the opinion in Sparks v. Colson, 109 Ky., 711, where the precise objections were urged and held to be insufficient.

Recurring to that portion of the affidavit, which relates to the occurrence on election day, and eliminating therefrom as insufficiently alleged, the statements made on information and belief, we have remaining the statement that White voluntarily approached the judge and charged him with having the intention of not giving White a fair trial, to which the judge's answer, in so far as he did answer, was unobjectionable. The offensive language was used by White, and to the judge.

It goes without argument that a litigant will not be permitted to wilfully insult the trial judge, particularly after his case has been prepared for trial, and the issues made up, in order to provoke a hostility that will require the judge to vacate the bench. If such a practice were permitted, an unscrupulous litigant could obtain rulings upon the preliminary questions of his case, and if they were unsatisfactory, he could insult the judge and thereby obtain another judge to try his case. It was such an abuse as this that led this court to use the strong language it did in the opinion in German Insurance Co. v. Landrum, supra. In the respect above referred to, the affidavit is made on information and belief only, and does not satisfy the rule laid down in German Insurance Co. v. Landrum, which requires the charges of the affidavit to be direct and certain in order that, if they be false, they would subject the party making them to a criminal punishment. In our opinion the affidavit was insufficient to require the judge to vacate the bench.

3. It is insisted that the court erred in giving the first, second and third instructions to the jury. Appellant offered an instruction which is in the exact language of the first instruction given by the court, and now complained of, with the exception that appellant's proffered instruction contains this additional clause: "Unless the jury believe as stated in the third or fourth instruc-

tions.'' The quoted clause was not contained in the instruction given by the court; and appellant insists that it was erroneous in not so referring to the third and fourth instructions under which the jury were authorized under the state of facts therein predicated, to find for the defendant. It might have been the better practice to so connect the instructions, but we do not think the omission to do so was a reversible error. The instructions were considered as a whole, and the third and fourth instructions were necessarily considered along with the first.

In 38 Cyc., 1598, it is said:

''The entire law of the case need not be stated in a single instruction, and it is not improper to state the law as applicable to particular questions in separate instructions if there is no conflict in the law as stated. Exceptions and qualifications of a rule, if stated in the charge, need not be stated in immediate juxtaposition with the rule. If all the instructions, considered as a series, present the law applicable to the case fully and accurately, it is sufficient.''

In L. & N. R. R. Co. v. Veach, 20 Ky. L. R., 407, 46 S. W., 493, objection was taken to an instruction upon the ground that it was confusing and misleading, in that it grouped a large number of propositions together; but, in overruling the objection, the court said:

''While it is true that this instruction groups a number of propositions together, it properly directs the attention of the jury to the conditions upon which plaintiff was entitled to recover, and we can not say that it was calculated to mislead an ordinarily intelligent jury.''

The third instruction reads as follows:

''If the jury believe from the evidence that prior to the execution of the option to Carnahan, the plaintiff, Jouett, with the knowledge that there would be no profit, commission or compensation on the sale to Carnahan, to the plaintiff in any event, or to the defendant, White, except upon a resale of said lands by said Carnahan or the defendant, consented that the Burt & Brabb Lumber Company might give said Carnahan an option to purchase said lands at $10 an acre, and relinquished any claim that he, the plaintiff, might have to any commission upon the sale of said lands to Carnahan under said option, and if they further believe from the evidence, that there was to be no profit, commission or compensation to the defendant on a sale to Carnahan, except

on a resale of the lands by Carnahan or the defendant, other than one already arranged for between White and Carnahan (if the jury believe from the evidence, a resale was then already arranged for between them), the jury should find for the defendant."

The objection to this instruction is, that it uses the words "arranged for" in a sense that is misleading, and prejudicial to appellant's rights. There was, in fact, no evidence of a resale. The sale, though nominally made to Carnahan, was, by agreement between Carnahan and White, a single sale to White and Carnahan and his associates, agreed upon before the option was procured. The conveyance to the Greasy Fork Coal & Timber Co. is referred to by White throughout his testimony as the resale meant by him in his defense. But, if this taking over of the title to the new company might be called a resale, still the expression "arranged for" could not have misled the jury, because it appears that the contract between White and Carnahan, which was evidenced by a writing, clearly and distinctly arranged, not only for the formation of the company, but for the transfer to it of this option and the rights under it. The language might have been a little more explicit, but we do not think it was misleading.

The principal objection, however, is made to the fifth instruction, which reads as follows:

"If the jury find for the plaintiff, they should allow him what they may believe from the evidence, was one-third of the value of the stock of the Greasy Fork Coal & Timber Company, which the jury may believe from the evidence, the defendant received as a commission for procuring a sale of the lands to be made to Carnahan, the value of the stock to be estimated as of the date the defendant received same, but the finding for the plaintiff, if any, should not exceed $22,000, the amount claimed by the plaintiff in the petition; and if there is any finding for the plaintiff, the jury may, or may not, in their discretion, provide in their verdict that interest on the sum they find shall run from July 30, 1910."

It is insisted that this instruction is erroneous in that it authorized a money recovery, while appellee could, at most, recover only one-third of the stock, in kind, which White received from Carnahan. The prayer of the petition is in the alternative, and prays for the stock or its value, which is put at $22,000. This objection might be sufficiently answered by pointing out that

appellant offered an instruction which likewise authorized a money recovery, in precisely the same terms as are contained in the fifth instruction given by the court. It is true that appellant's proffered instruction contained a slight variation, based upon the idea that Barker might be entitled to a share of the profits, but in the respect that it was based upon a money recovery, and none other, it was in the exact terms of the instruction given. This, of itself, prevents appellant from urging the objection he now raises.

But the instruction was not erroneous. The petition alleged, and it was not denied, that plaintiff had demanded of defendant one-third of the stock, or its value, but that defendant had refused to deliver said stock to plaintiff. Under these pleadings what kind of a recovery was appellee entitled to? Manifestly, if he was entitled to recover at all, the measure of his damage was the value of the stock which appellant refused to surrender. The authorities sustain the proposition that the breach of a contract to deliver personal property entitles the injured party to recover damages for the breach in assumpsit or covenant, according to the nature of the obligation. Mudd v. Phillips, Litt. Sel. Cas, 51, was a suit upon an agreement to deliver two slaves between eight and ten years old, and one of the questions was, at what age they should have been delivered. In disussing the measure of plaintiff's damage, the court said:

"It is clear, that slaves of eight years of age, would have satisfied the covenant; and, therefore, that the value of such slaves, at the time when the covenant was broken, would measure the plaintiff's damages, thus sustained. When the jury had added legal interest thereon, from the time of the breach up to the time of the assessment, they would have filled the measure of justice due to the covenantee."

In Owens v. Durham, 5 Dana, 537, Owens agreed to give Durham for his services as overseer, one-seventh part of the crop. Durham demanded his part of the crop, but Owens refused to give him any part of it. In delivering the opinion of the court, Chief Justice Robertson said:

"If Owens was guilty of a breach of covenant in not making the proper allotment when the crop was gathered, or when Durham's services were terminated, Dur-

ham was entitled to the value of his interest at that time."

And in Marr's Admr. v. Prather, 3 Met., 196, the suit was upon an obligation to pay in cash notes. The court held that it was an action for damages, and that the measure of the recovery was the value of the cash notes, saying:

"The amount which the plaintiff was entitled to recover or the instrument sued on was the value of the cash notes at the time they ought, by the terms of the contract, to have been paid, to which might have been added, by way of additional damages, interest on said value from the time indicated."

The fifth instruction was proper.

4. Finally, however, it is insisted that the verdict is against the weight of the evidence, and the judgment should be reversed for that reason. White stands uncontradicted in his testimony that of the $40,500 par value of stock he received from Carnahan as his share of the profits, he agreed with Carnahan to give, and did give ten per cent, or $4,050, of the par value thereof, to the Oneida Baptist School. This agreement formed a part of his contract with Carnahan; and, having been carried out, it reduced White's profit in stock from $40,500 par value, to $36,450 par value. In fixing their verdict at $13,500, the jury evidently based it upon the value of stock worth, at par, $40,500, since the verdict is exactly one-third of that sum. But, since White actually received stock of the par value of only $36,450, Jouett's recovery upon that basis would be only $12,150, or $1,350 less than the verdict. The verdict, therefore, can be sustained only upon the theory that the stock was worth more than par. The only evidence, however, as to the market value of the stock is found in White's testimony that he bought two shares at par, and in Carnahan's statement that he had obligated himself to buy a large number of shares, at par.

It is attempted to meet this objection by showing that although the stock was based upon a capitalization at $15 an acre, the land was worth as much as $20, or perhaps $25 an acre; that there were no debts against the corporation; and that the jury were therefore justified in finding that the stock was worth more than par. In the absence of a known market value, it is proper to admit evidence of the value of the corporation's assets and indebtedness, for the purpose of fixing the value of

the stock.  That rule is approved in 2 Cook on Corpora-
tions, 1256, in the following language:

"In general, the courts incline to the rule that the
true measure of damages is the value of the stock at the
time of the conversion, or a reasonable time thereafter.
By the phrase 'the value of the stock' is usually to be
understood the market value.  The fact that the shares
of stock have no known market value will not prevent·
recovery, where the actual value is ascertainable, in an
action to recover damages.  The value may be proven
by showing the value of the property and business of
the corporation, less the amount of the liabilities."

Under neither view did the proof justify the conclu-
sion that the stock was worth more than par.

We are satisfied, however, from the verdict, and all
the circumstances of the case, that the jury fixed White's
profit at stock of the par value of $40,500, when in reality
he received stock of the par value of only $36,450; and
in doing so they clearly gave appellee a verdict for $1,350
more than the evidence warranted.

For this reason the judgment is reversed for a new
trial.

The whole court sitting.